UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHYSICIANS FOR HUMAN RIGHTS,<br>1156 15th Street NW, Suite 1001<br>Washington, DC 20005,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF DEFENSE,<br>1600 Defense Pentagon<br>Washington, DC 20301-1155<br><br>and its components<br>Defense Intelligence Agency,<br>Building 6000<br>Washington, DC 20340-5100<br><br>United States Special Operations Command,<br>7701 Tampa Point Boulevard<br>MacDill AFB, FL 33621-5323<br><br>and United States Central Command,<br>7115 South Boundary Boulevard<br>MacDill AFB, FL 33621-5101<br><br>Defendants. | Case No. |

## COMPLAINT FOR INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for injunctive and other appropriate relief and to obtain the disclosure and release of agency records improperly withheld from plaintiff by defendant Department of Defense ("DOD") and its components Defense Intelligence Agency ("DIA"), United States Special Operations Command ("USSOC"), and United States Central Command ("CENTCOM").

## Jurisdiction and Venue

2.    This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## Parties

3.    Plaintiff Physicians for Human Rights ("PHR") is a not-for-profit organization with its principal place of business in Cambridge, Massachusetts. Its mission is to promote health by protecting human rights. It uses scientific methods and clinical medical skills to investigate allegations of human rights violations. PHR has conducted investigations of health and human rights in Iraq and Afghanistan and has worked around the world to expose war crimes. The goals of PHR's investigations include revealing the truth about human rights abuses, holding perpetrators accountable, demonstrating the scope of rights violations, and advocating an end to abuses. PHR publishes newsletters, reports, and informational materials for the public, many of which are available on its website, www.physiciansforhumanrights.org.

4.    DOD is a Department of the Executive Branch of the United States Government and includes component entities DIA, USSOC, and CENTCOM. DOD is an agency within the meaning of 5 U.S.C. § 552(f).

## Discovery and Investigation of a Mass Grave in Afghanistan

5.    International news stories and investigations from January 2002 to February 2004 reported that the bodies of as many as 2,000 Taliban fighters may lie in a mass grave at Dasht-e-

Leili, Afghanistan. This reported gravesite is approximately 78 miles west of Mazar-I-Sharif near Sheberghan. According to reports, hundreds of Taliban fighters died of asphyxiation at the end of November 2001 when transported in flatbed truck shipping containers from the site of their surrender in Konduz to the prison in Sheberghan. Their bodies were allegedly buried in December 2001.

6. According to reports, U.S. forces were providing security at the Sheberghan prison when some of the container trucks arrived.

7. PHR personnel visited the gravesite in January and February 2002 and documented skeletal remains (some with human tissue still attached, indicating recent burial), shoes, prayer beads, and prayer caps in the graves.

8. The mass graves were first reported in the American media in the *New York Times* in May 2002. A cover story in *Newsweek* magazine in July 2002 described the deaths, the gravesite, and surrounding events. The *Newsweek* article is appended to this complaint as Exhibit A.

9. In its article, *Newsweek* reported that DOD spokesman Lt. Col. Dave Lapan said that CENTCOM had questioned the U.S. forces in Afghanistan concerning the gravesite and the transfer of Taliban prisoners to Sheberghan prison. The article further reported that a senior DOD official said the commander of the U.S. forces had looked into the reports of the deaths.

10. After *Newsweek* released its lengthy report on the graves, State Department spokesman Phillip Reeker said that the U.S. would investigate the circumstances surrounding the gravesite.

11. In August 2002, General Tommy Franks was quoted in an article on cnn.com as calling for an investigation into allegations that hundreds of Taliban prisoners suffocated and were dumped into mass graves after surrendering to US-based forces in November 2001.

12. An August 2002 *New York Times* article reported that at a Pentagon briefing on August 26, 2002, Marine General Peter Pace told reporters that the U.S. military conducted an internal review into what happened at Sheberghan.

### Plaintiff's FOIA Requests

13. By letter dated June 21, 2006 to DOD, the U.S. Army, and CENTCOM, among others, plaintiff submitted Freedom of Information Act ("FOIA") requests for all records relating to the existence of a grave in or around Dasht-e-Leili in Afghanistan and records relating to any investigation of or correspondence about this grave or to U.S. military presence at or near the grave.

### Defendant DOD's Failure to Respond to Plaintiff's Request

14. By letter dated August 1, 2006, DOD provided an interim response regarding plaintiff's request for a fee waiver. This letter also notified plaintiff of DOD's additional referral of the request to the DIA for review and direct response.

15. By letter dated April 26, 2007, plaintiff sent an appeal to DOD under 5 U.S.C. § 552 because it had received no further information from DOD.

16. By letter dated August 6, 2007, DOD sent another an interim response to plaintiff's FOIA request. This letter noted that the DOD was conducting a search for additional documents and enclosed six documents deemed responsive to the FOIA request. These

4

documents included a draft of a letter from the Office of the Deputy Secretary of Defense to PHR, articles and letters from PHR's website, a *Washington Post* article written by the executive director of PHR, and various constituent letters to Members of Congress regarding the Afghanistan gravesite. None of these documents relates to any DOD investigation into the reports of a mass gravesite in Afghanistan.

17. To date, DOD has not provided the records requested by plaintiff in its FOIA request nor has DOD informed plaintiff of the outcome of the appeal, notwithstanding the FOIA's requirement of an agency response within twenty (20) working days of the appeal sent on April 26, 2007.

18. PHR has exhausted the applicable administrative remedies with respect to its FOIA request to DOD.

19. Defendant DOD has improperly withheld the requested records from PHR.

### DIA's Failure to Respond to Plaintiff's Request

20. On or before August 1, 2006, DOD referred plaintiff's FOIA request to DIA.

21. Plaintiff did not receive acknowledgment or communication from DIA, and plaintiff sent an appeal under 5 U.S.C. § 552 to DIA by letter on May 30, 2007.

22. On November 15, 2007, plaintiff, through counsel, checked the status of the appeal by phone, and DIA stated that plaintiff would have a response by the end of the month. No response followed.

23. To date, DIA has not provided the records requested by plaintiff in its FOIA request nor has DIA informed plaintiff of the outcome of the appeal, notwithstanding the FOIA's

requirement of an agency response within twenty (20) working days of the appeal sent on May 30, 2007.

24. PHR has exhausted the applicable administrative remedies with respect to its FOIA request to DIA.

25. Defendant DIA has improperly withheld the requested records from PHR.

## USSOC's Failure to Respond to Plaintiff's Request

26. By letter dated March 15, 2007, USSOC stated that the Department of Army referred plaintiff's request to U.S. Army Special Operations Command (USASOC), that USASOC referred the request to USSOC, and that USSOC did not find any responsive records.

27. By letter dated April 26, 2007, plaintiff appealed this decision under 5 U.S.C. § 552.

28. On November 30, 2007, plaintiff, through counsel, checked the status of the appeal by phone, and USSOC confirmed that the appeal was being processed.

29. To date, USSOC has not provided the records requested by plaintiff in its FOIA request nor has USSOC informed plaintiff of the outcome of the appeal, notwithstanding the FOIA's requirement of an agency response within twenty (20) working days of the appeal sent on April 26, 2007.

30. PHR has exhausted the applicable administrative remedies with respect to its FOIA request to USSOC.

31. Defendant USSOC has improperly withheld the requested records from PHR.

### CENTCOM's Failure to Respond to Plaintiff's Request

32. By letter dated August 1, 2006, CENTCOM confirmed receipt of plaintiff's FOIA request.

33. Because plaintiff received no further response to its FOIA request, plaintiff sent an appeal under 5 U.S.C. § 552 to CENTCOM by letter dated April 26, 2007.

34. On November 30, 2007, plaintiff, through counsel, checked the status of the appeal by phone, and CENTCOM confirmed that it was processing the appeal.

35. To date, CENTCOM has not provided the records requested by plaintiff in its FOIA request nor has CENTCOM informed plaintiff of the outcome of the appeal, notwithstanding the FOIA's requirement of an agency response within twenty (20) working days of the appeal sent on April 26, 2007.

36. PHR has exhausted the applicable administrative remedies with respect to its FOIA request to CENTCOM.

37. Defendant CENTCOM has improperly withheld the requested records from PHR.

### Count I: Against Defendants DOD, DIA, USSOC, and CENTCOM For Injunctive and Other Relief Under the Freedom of Information Act

38. PHR hereby incorporates by reference paragraphs 1 – 37 above.

39. 5 U.S.C. § 552(a)(3)(A) requires an agency to make records promptly available to any person upon request for reasonably identified records. 5 U.S.C. § 552(a)(4)(B) precludes the improper withholding of requested agency records.

40. 32 C.F.R. § 286.24 (2008) states that final determinations on appeals should be made within twenty (20) working days after receipt and allows ten (10) additional days if unusual circumstances are present.

41. As alleged in paragraphs 1 – 37 above, defendants DOD, DIA, USSOC, and CENTCOM have improperly withheld records from PHR relating to the mass grave in Dasht-e-Leili and have failed to timely respond to PHR's FOIA request appeals.

42. PHR has been harmed by defendants' actions as, among other things, it cannot, without the requested records, complete its investigation of, and report to the public concerning, possible human rights violations at Dasht-e-Leili.

### **Requested Relief**

WHEREFORE, plaintiff prays that this Court:

A. order defendant DOD (including DIA, USSOC, and CENTCOM) to disclose the requested records in their entireties and make copies available to plaintiff;

B. provide for expeditious proceedings in this action;

C. award plaintiff its costs and reasonable attorneys fees incurred in this action; and

D. grant such other relief as the Court may deem just and proper.

Dated: February 19, 2008

ROPES & GRAY LLP

By: /s/ Thomas M. Susman
Thomas M. Susman
D.C. Bar Number 151712
One Metro Center
Suite 900
700 12th Street, NW
Washington, DC 20005
(202) 508-4600

Attorney for Plaintiff,
PHYSICIANS FOR HUMAN RIGHTS

9

# Newsweek

# The Death Convoy Of Afghanistan

**Witness Reports And The Probing Of A Mass Grave Point To War Crimes. Does The United States Have Any Responsibility For The Atrocities Of Its Allies? A Newsweek Investigation.**

NEWSWEEK
Updated: 3:52 PM ET Oct 29, 2007

Trudging over the moonscape of Dasht-e Leili, a desolate expanse of low rolling hills in northern Afghanistan, Bill Haglund spotted clues half-buried in the gray-beige sand. Strings of prayer beads. A woolen skullcap. A few shoes. Those remnants, along with track marks and blade scrapes left by a bulldozer, suggested that Haglund had found what he was looking for. Then he came across a human tibia, three sets of pelvic bones and some ribs.

Mass graves are not always easy to spot, though trained investigators know the signs. "You look for disturbance of the earth, differences in the vegetation, areas that have been machined over," says Haglund, a forensic anthropologist and pioneer in the field of "human-rights archeology." At Dasht-e Leili, a 15-minute drive from the Northern Alliance prison at Sheber-ghan, scavenging animals had brought the evidence to the surface. Some of the gnawed bones were old and bleached, but some were from bodies so recently buried the bones still carried tissue. The area of bulldozer activity--roughly an acre--suggested burials on a large scale. A stray surgical glove also caught Haglund's eye. Such gloves are often used by people handling corpses, and could be evidence, Haglund thought, of "a modicum of planning."

Haglund was in Dasht-e Leili on more than a hunch. In January, two investigators from the Boston-based Physicians for Human Rights had argued their way into the nearby Sheberghan prison. What they saw shocked them. More than 3,000 Taliban prisoners--who had surrendered to the victorious Northern Alliance forces at the fall of Konduz in late November--were crammed, sick and starving, into a facility with room for only 800. The Northern Alliance commander of the prison acknowledged the charnel-house conditions, but pleaded that he had no money. He begged the PHR to send food and supplies, and to ask the United Nations to dig a well so the prisoners could drink unpolluted water.

But stories of a deeper horror came from the prisoners themselves. However awful their conditions, they were the lucky ones. They were alive. Many hundreds of their comrades, they said, had been killed on the journey to Sheberghan from Konduz by being stuffed into sealed cargo containers and left to asphyxiate. Local aid workers and Afghan officials quietly confirmed that they had heard the same stories. They confirmed, too, persistent reports about the disposal of many of the dead in mass graves at Dasht-e Leili.

That's when Haglund, a veteran of similar investigations in Rwanda, Sri Lanka, the Balkans and other scenes of atrocity, was called in. Standing at what he reckoned from the 'dozer tracks was an edge of the grave site, he pushed a long, hollow probe deep into the compacted sand. Then he sniffed. The acrid smell reeking up the shaft was unmistakable. Haglund and local laborers later dug down; at five feet, they came upon a layer of decomposing corpses, lying pressed together in a row. They dug a trial trench about six yards long, and in that short length found 15 corpses. "They were relatively fresh bodies: the flesh was still on the bones," Haglund recalls. "They were scantily clad, which was consistent with reports that [before they died] they had been in a very hot place." Some had their hands tied. Haglund brought up three of the corpses, and a colleague conducted autopsies in a tent. The victims were all young men, and their bodies showed "no overt trauma"--no gunshot wounds, no blows from blunt instruments. This, too, Haglund says, is "consistent" with the survivors' stories of death by asphyxiation.

How many are buried at Dasht-e Leili? Haglund won't speculate. "The only thing we know is that

it's a very large site," says a U.N. official privy to the investigation, and there was "a high density of bodies in the trial trench." Other sources who have investigated the killings aren't surprised. "I can say with confidence that more than a thousand people died in the containers," says Aziz ur Rahman Razekh, director of the Afghan Organization of Human Rights. NEWSWEEK's extensive inquiries of prisoners, truckdrivers, Afghan militiamen and local villagers--including interviews with survivors who licked and chewed each other's skin to stay alive--suggest also that many hundreds of people died.

The dead of Dasht-e Leili--and the horrific manner of their killing--are one of the dirty little secrets of the Afghan war. The episode is more than just another atrocity in a land that has seen many. The killings illustrate the problems America will face if it opts to fight wars by proxy, as the United States did in Afghanistan, using small numbers of U.S. Special Forces calling in air power to support local fighters on the ground. It also raises questions about the responsibility Americans have for the conduct of allies who may have no --interest in applying protections of the Geneva Conventions. The benefit in fighting a proxy-style war in Afghanistan was victory on the cheap-- cheap, at any rate, in American blood. The cost, NEWSWEEK's investigation has established, is that American forces were working intimately with "allies" who committed what could well qualify as war crimes.

Nothing that NEWSWEEK learned suggests that American forces had advance knowledge of the killings, witnessed the prisoners being stuffed into the unventilated trucks or were in a position to prevent that. They were in the area of the prison at the time the containers were delivered, although probably not when they were opened. The small group of Special Forces soldiers were more focused at the time on prison security, and preventing an uprising such as the bloody outbreak that had happened days earlier in the prison fort at Qala Jangi. The soldiers surely heard stories of deaths in the containers, but may have thought them exaggerated. They also may have believed that the dead were war casualties, or wounded prisoners who, among thousands of their comrades, simply didn't survive the rugged journey from the surrender point to the prison. But it's also true that Pentagon spokesmen have obfuscated when faced with questions on the subject. Officials across the administration did not respond to repeated requests by NEWSWEEK for a detailed accounting of U.S. activities in the Konduz, Mazar-e Sharif and Sheberghan areas at the time in question, and Defense Department spokespersons have made statements that are false.

Questions can be raised, as well, about international agencies. How seriously has the United Nations pursued investigations of what happened at Sheberghan? The reports of atrocity come at a time when the international community is desperately trying to bring stability to Afghanistan. Well-meaning officials may be wondering if a full-scale investigation might set off a new round of Afghan slaughter. Would it be worth it? A confidential U.N. memorandum, parts of which were made available to NEWSWEEK, says that the findings of investigations into the Dasht-e Leili graves "are sufficient to justify a fully-fledged criminal investigation." It says that based on "information collected," the site "contains bodies of Taliban POW's who died of suffocation during transfer from Konduz to Sheberghan." A witness quoted in the report puts the death toll at 960. Yet the re--port also raises urgent questions. "Considering the political sensitivity of this case and related protection concerns, it is strongly recommended that all activities relevant to this case be brought to a halt until a decision is made concerning the final goal of the exercise: criminal trial, truth commission, other, etc."

The militia leader whose forces allegedly carried out the killings is Gen. Abdul Rashid Dostum, one of Afghanistan's most ruthless and effective warlords. Dostum's spokesperson, Faizullah Zaki, told NEWSWEEK that many people did die of suffocation. But he put the total number at "between 100 and 120 people, a few from each container," and said that some of them "were seriously injured and died en route." He suggested that the uprising at Qala Jangi prison, just three days earlier, might have affected their treatment. "If the incident at Qala Jangi hadn't happened, it's possible that the prisoners would have been transferred more peacefully. There would have been less irregularities," he said, adding: "They suffocated. Died, not killed. Nobody killed anybody." Zaki also said that General Dostum was not in the place where the prisoners were loaded into containers. "The technical details of the transfer were left to lower-level commanders," he said, adding that "there was a handful of American soldiers that didn't leave [Dostum's] side" during the period in question.

The close involvement of American soldiers with General Dostum can only make an investigation all the more sensitive. "The issue nobody wants to discuss is the involvement of U.S. forces,"

says Jennifer Leaning, professor at the Harvard School of Public Health and one of the pair of Physicians for Human Rights investigators who pushed their way into Sheberghan. "U.S. forces were in the area at the time. What did the U.S. know, and when and where--and what did they do about it?"

The Taliban and Qaeda forces at Konduz surrendered in a negotiated deal that took two to three days to hammer out. According to Shams-ul-Haq (Shamuk) Naseri, a mid-level Northern Alliance commander who was present, the talks were held in the presence of three American intelligence officers and a dozen or more Special Forces soldiers. Northern Alliance commanders, including General Dostum, agreed to relatively generous conditions: The Afghan fighters would be allowed to go home to their villages. Most of the Pakistanis could also return home after the Americans picked out suspected Qaeda operatives. Arabs and other foreign fighters would be turned over to the United Nations or some other international organization. According to another Afghan present at the talks, Said Vasiqullah Sadat, the Taliban representatives insisted that their men surrender to General Dostum, because they figured he was the least likely to seek revenge for past killings. The surrender would formally start on Sunday, Nov. 25--to give time for the Taliban leaders to sell the deal to their forces in Konduz.

The day after negotiations ended, roughly 400 hard-core fighters made a break for it anyway, fleeing west. But the vast majority of fighters trapped in Konduz surrendered "like sheep," according to Naseri. "One went and the rest followed." The agreed site for the actual surrender was Yerganak, a desert spot about five miles west of Konduz. Most of the top Taliban and foreign commanders drove out, and their vehicles were promptly confiscated by the Northern Alliance. The rest walked. Four checkpoints had been set up at Yerganak to disarm the fighters and load them onto whatever vehicles were available: pickups, big-wheeled, open-topped Russian Kamaz trucks, even some container trucks. But the numbers streaming out of Konduz overwhelmed the facilities, and most of those surrendering waited three or four days in the desert.

Dostum and another Northern Alliance commander, Atta Mohammed, were at Yerganak to monitor the surrender. So were dozens of American Special Forces troops, according to U.S. and Afghan participants. Some of the Special Forces teams were zipping around the area on four-wheeler motorcycles; Dostum was filmed at the time enjoying a ride on the back of one. The Americans provided much of the food and water given to the waiting masses. But they were there primarily to provide credible muscle, a message that was reinforced by the frequent appearance of U.S. bombers streaking overhead.

At about this time, soldiers from Dostum's militia arrived at a container depot on the outskirts of Mazar-e Sharif, about 100 miles to the west, and recruited a driver we'll call Mohammed, a bearded man in his mid-40s. (NEWSWEEK has changed the names of several witnesses in this report to lessen the chance of reprisals.) Mohammed was told that his container truck was needed to ship captive Taliban fighters to Sheberghan prison. He was to pick them up that evening at the old fort in Qala Zeini, which lies on the road between Mazar-e Sharif and Sheberghan. The road actually passes through the fort: one gate in, one gate out.

Mohammed arrived at Qala Zeini about 7 that evening. Several other container trucks were already waiting inside the fort. So were about 150 soldiers, all Afghans. At about 9, the prisoners--a mix of Afghans, Pakistanis, Arabs and Chechens--arrived from Yerganak in open trucks and pickups. Soldiers ordered the prisoners down from the trucks and stripped them of their turbans, caps and vests. Then they herded the captives into the containers, as many as 200 to a truck. The fighters realized they were not going home, as promised. "F--- Shamuk Naseri," one driver recalls a prisoner's screaming. "He betrayed us." The doors of the container trucks were locked.

The prisoners probably realized their fate. "Death by container" has been a cheap means of mass murder used by both the Taliban and the Northern Alliance for at least five years. Abandoned freight containers--international standard size, 40 feet by 8 feet by 8 feet--litter the roads of Afghanistan, rusting reminders of the many tons of aid that have poured into the country over the past 20 years. It was reputedly a savage Uzbek general named Malik Pahlawan who first saw the container's potential as a killing machine in 1997. After a Taliban assault on Mazar-e Sharif had been repulsed, Pahlawan--according to a subsequent U.N. report--killed some 1,250 Taliban by leaving them in containers in the desert sun. When the containers were opened, it was found the inmates had been grilled black. When the Taliban took Mazar-e Sharif in 1998, they in turn killed several hundred enemies in the same fashion.

In the case of the Taliban prisoners from Konduz, the November temperatures weren't hot enough to blacken them. But after a few hours, they started beating on the sides of their overstuffed cells. "We're dying. Give us water!" some shouted. "We are human, not animals." Mohammed used a hammer and spike to bang holes in his container, until one of Dostum's soldiers heard the banging and angrily demanded to know what he was doing. Mohammed said that he was sealing holes to prevent the prisoners' escape.

After the soldier had gone, one of the prisoners in the container stuck his face close to one of the holes. "Are you a Muslim?" he asked. "Yes," Mohammed replied. "Look at my tongue," said the prisoner, and stuck it out. It was cracked from dehydration. Mohammed filled a two-liter Fanta bottle with water and passed it in through the hole. He also pushed in 10 pieces of bread, all he had. "Thank Allah you are a Muslim," the prisoner said.

Some of the other drivers NEWSWEEK has traced say they, too, tried to help. One described how he also poked holes in his container and tried to bring water to the prisoners. But Dostum's soldiers spotted him, and five of them gave him a beating with their rifle butts. Mohammed saw the beating and spent the rest of the night inside his locked cab.

Someone else saw a similar scene at Qala Zeini, and tried to send a warning. In December, Abdullah was in the settlement of Langar Khaneh, which is close to the fort of Qala Zeini. When the gates of Qala Zeini were closed for a day and a half, and traffic diverted through Langar Khaneh, Abdullah's curiosity was aroused. He made his way over to the fort and peered inside. As he watched, four container trucks were driven into the fort. Not long after, prisoners arrived in pickups and Kamaz trucks, he says. Soldiers in the fort--Dostum's men, Abdullah says--proceeded to tie up the prisoners with their own turbans.

Those who didn't move fast enough or who tried to resist were beaten. Most prisoners, says Abdullah, were bound around their upper arms and blindfolded, but some were hogtied. Unruly prisoners were grabbed by hand and foot and swung into the containers on their bellies. When the containers were full, they were locked. Abdullah was in no doubt what he was witnessing. "The only purpose was to kill the prisoners," he says.

Wondering whom he could alert to these preparations, Abdullah recalled an acquaintance who was working with the American forces based in Mazar. He was Said Vasiqullah Sadat, who was at the surrender negotiations and served as a translator for the Americans. Abdullah says that he told Vasiqullah what was happening, and he says Vasiqullah responded: "We will act." The next day, Abdullah said, a group of Americans arrived at Qala Zeini in two dust-colored pickups. But the containers were gone, and--says Abdullah--the Americans turned around and drove back to Mazar.

Vasiqullah is cautious when asked about this version of events. He says that on the fourth day of the surrender at Yerganak--Nov. 28--he headed back to Mazar with several cars full of American soldiers. Some of these were billeting in Atta Mohammed's headquarters in Mazar. Vasiqullah confirms that he "soon" heard about prisoners' being transferred into containers at Qala Zeini. But he will not confirm that he heard this from the witness from Langar Khaneh. Nor will he confirm that he passed the news on to the Americans he was working with. "The Americans were distracted at this time," he says. The uprising at the Qala Jangi prison in Mazar-e Sharif--in which CIA operative Mike Spann was killed and the American John Walker Lindh was discovered--had occurred on Nov. 25. "Many of them were taking care of arrangements for shipping Mike Spann's body out of Mazar airport." But, says Vasiqullah, the containers could not have remained a secret for long. "I think the Americans found out soon," he says. "They were at Sheberghan prison from the beginning."

At 11 a.m. on Nov. 29, according to the driver Mohammed, a convoy of 13 container trucks set out from Qala Zeini. Each driver had soldiers in the cab beside him. A driver we'll call Ghassan, who had picked up his load of human cargo at a concrete bridge 31 miles west of Mazar-e Sharif, was also on the move around this time. He recalls that some in his container were alive, and beating on the sides. "They just want water... Keep driving," he was ordered.

By the time the trucks arrived at Sheberghan prison, many were ominously quiet. Mohammed was the driver of the second truck in line, but he got down from his cab and walked into the prison courtyard as the doors of the lead truck were opened. Of the 200 or so who had been loaded into

the sealed container not quite 24 hours before, none had survived. "They opened the doors and the dead bodies spilled out like fish," says Mohammed. "All their clothes were ripped and wet."

Mohammed says all 176 prisoners inside his truck survived because he had disobeyed orders and punched holes in the sides. (His account is supported by other witnesses.) He and others also say that no Americans were present when the trucks in his convoy were opened.

The following day, Nov. 30, a fresh convoy of seven trucks arrived at Sheberghan. The day after, Dec. 1, brought a third convoy--also seven trucks. NEWSWEEK has traced drivers from both later convoys. Their recollections are that most of those containers contained many dead bodies. But not all. The inmates of one truck in those convoys passed about 45,000 Pakistani rupees (about $750) to the driver through a crack in the floor as a bribe to cut air holes and spray in water through a hose. All 150 inmates survived. In at least one container, the prisoners themselves managed to rip holes in the wooden floor, and all of them survived.

Abdul, a 28-year-old Pashtun, is one who lived. NEWSWEEK interviewed him in Sheberghan prison. He recalls that his container was packed to the breaking point. After nearly 24 hours without water, Abdul says, the prisoners were so desperate with thirst that they began licking the sweat off each other's bodies. Some prisoners began to lose their reason and started biting those around them. Abdul's was one of the containers in the third convoy to Sheberghan: by the time they reached the prison, he says, only 20 to 30 in his container were alive.

Other survivors now in Sheberghan tell almost identical stories. One 20-year-old was shoved into a fully packed container. After about eight hours, he thinks, the prisoners began kicking the sides of the container and shouting for air and water. None came. Some of the prisoners began using their turbans to soak and drink the sweat off each other's bodies. After a few more hours many of the prisoners started going crazy and bit each other's fingertips, arms and legs. Anything to get moisture. By the time they reached Sheberghan, the young man says, only about 40 in his container were still alive.

For some, the agony in the containers was intensified because they were tied up. This appears to have been a fate reserved for Pakistani--and perhaps other non-Afghan--prisoners. Mahmood, 20, says he surrendered at Konduz along with 1,500 other Pakistanis. All were bound hand and foot either with their own turbans or with strips ripped from their clothing, he says. Then they were packed in container trucks "like cattle," he says. He reckons that about 100 people died in his container.

The drivers remain tormented by what they took part in. "Why weren't there any United Nations people there to see the dead bodies?" asks one. "Why wasn't anything being done?" Another driver shook uncontrollably as he spoke with NEWSWEEK.

The convoys of the dead and dying, along with many truckloads of living prisoners, seem to have arrived at Sheberghan for perhaps 10 days. Prying eyes were kept away. The Red Cross, learning of the arrivals of prisoners from Konduz, applied on Nov. 29 to get into Sheberghan. Dostum's commander at the prison promised that access would be granted within 24 hours. In fact, it was not until Dec. 10 that the Red Cross got into the prison. By then, most of the bodies had probably been buried. (Dostum's spokesman denies that access was blocked by prison officials.)

There were witnesses near the burial site who noticed unusual activity. The hamlet of Lab-e Jar is about half a mile east of the grave site. On several nights in the first half of December, Dostum's soldiers forbade the villagers to leave their homes. Most of the villagers are now too frightened to talk. "Bodies have been buried there for years," says one. "You know what happened. I know what happened. But nothing is going to change if we talk about it." Still, NEWSWEEK found some who were willing to say what they saw. One man, 49, claims that around the first week in December, Dostum's soldiers blocked the dirt road running past Dasht-e Leili for several days. "No cars, no donkey carts, not even pedestrians were allowed to go down the road," he says. He personally saw four or five container trucks at the burial site, he says. When U.N. investigators talked with the people of Lab-e Jar in May, two residents told of seeing bulldozers at work on the site around the middle of December.

A widening circle of organizations and individuals know, in broad terms, what happened after the

fall of Konduz. The Red Cross has questioned survivors and compiled a report about the events; top officials at the Red Cross's Geneva headquarters have met to discuss, inconclusively, what to do next. A pair of U.N. investigators were present when Haglund dug his trial trench across the Dasht-e Leili grave site. After questioning local witnesses, they, too, compiled a report. Two U.N. entities--the Assistance Mission to Afghanistan and the U.N. High Commissioner for Human Rights--have also been mulling what to do. "You have to understand, you're dealing with a potentially explosive issue here," says a Red Cross official in Afghanistan, explaining why he was hesitant to discuss the matter. Until now, anyway, the American military has not conducted a full-fledged investigation, nor has it been asked to participate in one by other agencies. U.N. sources say that their inquiries have not implicated U.S. forces. Publicly, the Pentagon has kept its distance. At the end of January, Department of Defense officials were told (by the PHR) of the discovery of what appeared to be a recent mass grave. In late February, officials at the Pentagon and the State Department were given confidential copies of the first formal report compiled by Haglund and his colleagues at the PHR. Consistently, however, the Pentagon has responded that Central Command investigated and found that U.S. troops know nothing of any killings--that the Pentagon indeed has no reason to believe there were killings. In June, DOD spokesman Lt. Col. Dave Lapan said that Central Command had questioned individually the forces in Af-ghanistan "several months ago": "Central Command looked into it and found no evidence of participation or knowledge or presence. Our guys weren't there, didn't watch and didn't know about it--if indeed anything like that happened." A DOD statement a week later was emphatic: "No US troops were present anywhere near that site in November. US troops were present in the December/January timeframe when the mass graves were discovered."

But is that entirely true? The American unit most directly involved was the 595 A-team, part of the Fifth Special Forces Group based at Fort Campbell, Ky. The leader of the dozen-man 595 was Capt. Mark D. Nutsch. Throughout the Afghanistan operation, the Pentagon insisted that reporters identify Special Forces personnel by their first names only, claiming this was necessary to protect their families back home from possible terrorist reprisals. But the Army waived that concern in April, when--at the instigation of his Army superiors--the Kansas state Legislature passed a resolution of both houses honoring Captain Nutsch, a 33-year-old native of Kansas. Nutsch's wife, Amy, and their baby daughter, Kaija, born while Nutsch was in Afghanistan, were present at the very public ceremony. Contacted recently by NEWSWEEK about the container deaths, Nutsch said he did not want to discuss them.

The Special Forces A-teams were the shock troops of the U.S. assault on the Taliban. They were the crucial link between the Northern Alliance militia on the ground and U.S. firepower in the air. Attached to each A-team in the Afghan campaign was at least one Air Force Special Operations soldier called a combat air controller. It was the high-precision airstrikes called in by those CACs that destroyed the Taliban forces. Each A-team was assigned to a specific local commander, and 595's assignment was to work with General Dostum.

595's role in the Afghan conflict made them legends to the wider public. Heloed into Afghanistan, like the rest of the teams, in a Special Forces Chinook, they met up with Dostum on Oct. 19 at his headquarters at Darra-e Suf in the mountain fastnesses south of Mazar-e Sharif. It was the 595 unit that famously carried out its missions on horseback; it was snippets from Nutsch's dispatches that a euphoric Defense Secretary Donald Rumsfeld took to reading at his press briefings. Invigorated --by American air power--and lubricated by the money distributed lavishly to wavering locals by the CIA paramilitaries--Dostum and his fellow Northern Alliance commanders swept north out of the mountains. The climax of the brief campaign began on Nov. 4, when the Northern Alliance launched a three-pronged assault on the major city in the north, Mazar-e Sharif, orchestrated and micromanaged by an assembly of Special Forces, including two A-teams.

595 members had been with Dostum at the surrender negotiations, and then again at the actual surrender at Yerganak. As a consequence they were not with their CIA colleagues, Mike Spann and Dave Tyson, when that pair went to Qala Jangi prison to question the fresh batch of Qaeda and Taliban hard-liners who had arrived there after the abortive breakout from Konduz. The 595 commander, Nutsch, felt bitter about Spann's death. "This was a guy we considered part of our unit," he told Robert Young Pelton, a reporter working for CNN and National Geographic Adventure. "If we had been there, Mike's death would not have happened."

Over the three days that the first convoys of dead were arriving at Sheberghan, Special Forces troops were in the area. There was also a separate, four-man U.S. intelligence team, in combat gear, at the prison doing first selections of Qaeda suspects for further questioning. According to

Pelton, a swashbuckling freelancer who specializes in writing about dangerous places, Special Forces soldiers were mainly concerned about security at the prison. At the same time the containers of dead were arriving, many truckloads of living prisoners were also streaming in: On the evening of Dec. 1, for instance, a container arrived bearing the 86 survivors from Qala Jangi. One of them was John Walker Lindh. It was the 595 team's medic, Bill, who first treated Lindh. Pelton believed at the time, and still does, that the dead from container trucks numbered "40-some odd" and were mostly people who died of wounds suffered in the siege of Konduz. "When I was with 595, we went over this time and again," says Pelton. "What happened is that these people basically died because they were wounded." A senior Defense Department official, speaking to NEWSWEEK on background, said the Pentagon asked the commander of the Fifth Special Forces Group to look into the reports of container deaths. That commander, Col. John Mulholland, reported back that the A-team knew that numbers, perhaps even large numbers, of Taliban prisoners had died on the journey to Sheberghan. But the Special Forces believed that these deaths had occurred from wounds or disease. news-week put this account to Colonel Mulholland through the public-affairs office of the Special Operations Command, but got no response by the time NEWSWEEK went to press.

For the Red Cross, the killings at Sheberghan represented an agonizing dilemma. The organization's code of operating out of the public eye--a trade-off that allows them access to places no one else is allowed to go, and enables them to provide aid to people in the most difficult circumstances--inhibited its officials from going public with what they heard. "We approached the ICRC more than two months ago to look into this, and they showed no interest," says Aziz ur Rahman Razekh of the Afghan Organization of Human Rights. "We got a frosty reception."

In fact, the Red Cross was concerned from the start about the fate of prisoners turning up at Sheberghan. The Taliban's surrender of the northern towns was an extended process; and the first dribble of prisoners from Konduz--captured on its outskirts--began to arrive at Sheberghan on Nov. 22-23. The ICRC office in Mazar-e Sharif learned of these arrivals; and on Nov. 29, a small team sought entry to Sheberghan prison. They were turned away. Asked about this now, an ICRC official says: "The authorities did not want us there." (Dostum's spokesman denies that prison officials refused them access.)

Not until Dec. 10 did the Red Cross manage to talk their way into Sheberghan to interview the new prisoners. They swiftly heard about the horrors of the containers. When NEWSWEEK first approached a Red Cross official to ask about the treatment of prisoners from Konduz, his immediate response was: "I can't talk about containers." Told of the stories that prisoners in Sheberghan had already given to news-week, he responded in some anguish: "If you're hearing stories about containers now, what do you think we were hearing about then?"

Apparently caught between outrage and its own code of secrecy, the Red Cross may have sought to stir attention to Sheberghan indirectly. In mid-January John Heffernan and Jennifer Leaning of the PHR met by chance in Kabul with two Red Cross officials--one a senior official based in ICRC headquarters in Geneva. The Geneva official told them that the Red Cross had, they recall her saying, "grave concerns" about the treatment of prisoners by U.S. forces and their allies; and she urged them that this topic was "worth exploring." That was why the PHR pair went up to Sheberghan. At the start of May, the PHR--frustrated by a lack of response in either Kabul or Washington to their private briefings on Haglund's discoveries at Dasht-e Leili--issued a report describing his findings. The Red Cross chimed in, producing for reporters--this was at the Red Cross Kandahar office--a survivor from one of the containers: Sardar Mohammed, 23, from Kandahar. Mohammed reckoned, he said, that they had been packed 150 to a container. And he claimed that he and his fellow survivors had tallied up more 1,000 who had not survived the ordeal.

It may not be easy for Americans to summon much sympathy for Taliban or Qaeda prisoners. But the rules of war cannot be applied selectively. There is no real moral justification for the pain and destruction of combat if it is not to defend the rule of law. The line is tough to hold even in a conventional conflict. In a proxy war, it's much more difficult. The dead at Dasht-e Leili are proof of that.

URL: http://www.newsweek.com/id/65473

© Newsweek Mag

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

PHYSICIANS FOR HUMAN RIGHTS
1156 15th Street NW, Suite 1001
Washington, DC 20005,

## DEFENDANTS

U.S. DEPARTMENT OF DEFENSE, and its components Defense Intelligence Agency, United States Special Operations Command, and United States Central Command,

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Thomas M. Susman
Ropes & Gray LLP
One Metro Center
Suite 900
700 12th Street, NW
Washington, DC 20005
(202) 508-4600

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. Habeas Corpus/ 2255 | H. Employment Discrimination | I. FOIA/PRIVACY ACT | J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. Labor/ERISA (non-employment) | L. Other Civil Rights (non-employment) | M. Contract | N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ⦿ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
5 U.S.C. § 552

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 2/19/2008    SIGNATURE OF ATTORNEY OF RECORD _[signature]_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.