THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | * | |
| PHYSICIANS FOR HUMAN RIGHTS, | | |
| | * | |
| Plaintiff, | | |
| | * | Civil Action No.: RDB-08-273 |
| v. | | |
| | * | |
| U.S. DEPARTMENT OF DEFENSE, et al., | | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Physicians for Human Rights, a non-profit human rights group, filed the present action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522 *et seq.*, seeking to compel Defendants, the Department of Defense ("DOD") and its components, the Defense Intelligence Agency ("DIA"), United States Special Operations Command ("USSOCOM"), and United States Central Command ("CENTCOM"), to reveal documentary information relating to a mass gravesite at Dasht-e-Leili, Afghanistan, where Taliban fighters are alleged to be buried.[1] Currently pending are the parties' cross-motions for summary judgment. The parties' submissions have been reviewed and a hearing was conducted on November 4, 2009. For the reasons explicated below, this Court issues the following memorandum and order.

## BACKGROUND

According to media reports, in late 2001, several thousand Taliban fighters surrendered to the Northern Alliance after a battle in Konduz, Afghanistan. *See* Pl.'s Exs. 3-6. Northern

---

[1] Plaintiff filed its lawsuit in the U.S. District Court for the District of Columbia and this case was originally assigned to Judge Colleen Kollar-Kotelly. Because of the high volume of cases currently pending before that court, the present case was reassigned to the undersigned on June 19, 2009. (Paper No. 25.)

Alliance soldiers under the command of General Abdul Rashid Dostum then crammed the surrendered Taliban fighters into sealed cargo containers and transported them 200 miles to a Northern Alliance prison at Sheberghan, a city in northern Afghanistan. *Id.* Approximately one thousand of the Taliban prisoners are alleged to have died of asphyxiation during the journey, and their bodies were allegedly buried in a mass grave in nearby Dasht-e-Leili in December of 2001. *Id.*

Plaintiff Physicians for Human Rights ("PHR") is a non-profit organization of health care professionals devoted to the investigation of alleged human rights violations. Compl. ¶ 3. In January and February of 2002, PHR conducted on-the-ground forensic investigations of the gravesite at Dasht-e-Leili and subsequently issued a report summarizing their findings. Pl.'s Ex. 1. Throughout 2002, news sources reported on the underlying events and PHR's investigations into the mass gravesite. Pl.'s Exs. 3-6. PHR notes that while there is no indication that the U.S. military was involved in the deaths, U.S. military personnel were reportedly in the region at the time and investigated the circumstances surrounding the gravesite. Compl. ¶¶ 6, 9-12. PHR cites a *Newsweek* magazine article from 2002, which quotes Department of Defense spokesman Lt. Col. Dave Lapan as saying that United States Central Command ("CENTCOM") had "looked into [the alleged killings] and found no evidence of participation or knowledge or presence" by American forces. Pl.'s Ex. 3, at 6. The article also notes that the Pentagon had asked the commander of the Fifth Special Forces Group, Col. John Mulholland, to look into the container deaths. Col. Mulholland reportedly confirmed that large numbers of Taliban prisoners had died on the journey to Sheberghan, but that Special Forces had determined that their deaths had resulted from wounds and disease. *Id.* at 7.

On June 21, 2006, PHR submitted a FOIA request to the United States Department of State ("State Department"), the Department of Defense ("DOD"), the Department of the Air Force, the Department of the Army, CENTCOM, and the Central Intelligence Agency ("CIA"), which included requests for nine specific categories of records. Pl.'s Ex. 2. PHR's petition seeks documents relating to, *inter alia*, the deaths of the Taliban prisoners, the mass graves, and the investigations conducted by the U.S. military into the underlying events. *Id.* On April 26, 2007, after the FOIA deadline passed without receiving any documents, PHR submitted an administrative appeal to the DIA, USSOCOM, and CENTCOM,[2] but no response was given to the appeal. Pl.'s Ex. 8. On August 6, 2007, DOD released to PHR six documents it deemed responsive. Pl.'s Ex. 9.

PHR filed a complaint in the U.S. District Court for the District of Columbia on February 19, 2008, alleging that the DOD and three of its components, DIA, USSOCOM, and CENTCOM, were in violation of their obligations under FOIA. Defendants answered the Complaint on April 28, 2008, and PHR provided Defendants with additional time to complete their searches. The DOD, the State Department and the CIA have since provided approximately 60 documents to PHR, some of which were redacted, and all of which originated with the DOD. Pl.'s Mot. Summ. J. at 6.

On October 3, 2008, Defendants filed the pending Motion for Summary Judgment (Paper No. 15) with several supporting affidavits, and on November 17, 2008, PHR filed its Cross Motion for Summary Judgment (Paper No. 16). After obtaining a time extension, Defendants filed its Reply brief along with several supplemental affidavits that aim to clarify and correct any

---

[2] The Defense Intelligence Agency ("DIA") and United States Special Operations Command ("USSOCOM") were not recipients of PHR's initial FOIA request. However, the DIA received a request on referral from the Department of Defense, and USSOCOM received the request on referral from the Department of the Army. Pl.'s Mot. Summ. J. at 6 n.3.

alleged inadequacies in the description of its actions taken in response to the FOIA request. (Paper No. 20.)  On June 19, 2009, the present case was reassigned to the undersigned United States District Judge.  (Paper No. 25.)  This Court conducted a hearing on November 4, 2009.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  A court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In the context of an action filed under the Freedom of Information Act, a district court reviewing a motion for summary judgment conducts a *de novo* review of the record, and the responding federal agency bears the burden of proving that it has complied with its obligations under the Act.  5 U.S.C. § 552(a)(4)(B).  To prevail on summary judgment, an agency must demonstrate "that it has conducted a search reasonably calculated to uncover all relevant information, which either has been released to the requester or is exempt from disclosure."  *Thomas v. HHS, Food & Drug Admin.*, 642 F. Supp. 2d 5, 8 (D.D.C. 2009) (internal citations

omitted).  On the other hand, in opposing a motion for summary judgment or cross-moving for

summary judgment, a FOIA plaintiff cannot simply rest upon conclusory statements, but must

instead "set forth 'affirmative evidence' showing a genuine issue for trial."  *Broaddrick v. Exec.

Office of President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (quoting *Laningham v. U.S. Navy*, 813

F.2d 1236, 1241, 259 U.S. App. D.C. 115 (D.C. Cir. 1987)).

To meet its burden at summary judgment, an agency may rely upon declarations and

*Vaughn* indexes[3] to describe, in reasonable detail, the nature of its search and the withheld

material, and to explain why such material falls within the claimed FOIA exemptions.  *See Kidd

v. DOJ*, 362 F. Supp. 2d 291, 294 (D.D.C. 2005).  Through the submission of appropriate

affidavits, an agency must show "beyond material doubt . . . that it has conducted a search

reasonably calculated to uncover all relevant documents."  *Weisberg v. DOJ*, 705 F.2d 1344,

1351, 227 U.S. App. D.C. 253 (D.C. Cir. 1983).  In addition, an agency "bears [the] burden of

demonstrating that . . . all information that falls within the class requested either has been

produced, is unidentifiable, or is exempt from disclosure."  *Cole v. DOJ*, Civ. Act. No. 05-674,

2006 U.S. Dist. LEXIS 69418, 2006 WL 2792681, at *1 (D.D.C. Sept. 27, 2006) (citation

omitted).

## ANALYSIS

In resolving the pending cross-motions for summary judgment this Court must address

(1) whether Defendants conducted reasonably adequate searches for responsive documents under

FOIA; and (2) whether Defendants properly withheld information under the claimed FOIA

exemptions.

---

[3] A *Vaughn* index is an affidavit provided by a government agency that lists each withheld document, or portion
thereof.  The index correlates each withholding with a specific FOIA exemption and provides the agency's
justification for nondisclosure.  *See Vaughn v. Rosen*, 484 F.2d 820, 157 U.S. App. D.C. 340 (D.C. Cir. 1973), *cert.
denied*, 415 U.S. 977, 94 S. Ct. 1564, 39 L. Ed. 2d 873 (1974).

## I.      Adequacy of Defendants' Searches for Responsive Documents

To comply with its search responsibilities under FOIA, a government agency must "show beyond material doubt 'that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'"  *People for the American Way Found. v. National Park Service*, 503 F. Supp. 2d 284, 292 (D.D.C. 2007) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68, 287 U.S. App. D.C. 126 (D.C. Cir. 1990)).  "The adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case."  *Weisberg*, 705 F.2d at 1351 (internal citations and quotations omitted).  An agency will not be granted summary judgment "if a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials.'"  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326, 336 U.S. App. D.C. 386 (D.C. Cir. 1999) (quoting *Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 837, 197 U.S. App. D.C. 305 (D.C. Cir. 1979)).  However, there is no requirement under FOIA that an agency's search be exhaustive, for "the issue is *not* whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate."  *Perry v. Block*, 684 F.2d 121, 128, 221 U.S. App. D.C. 347 (D.C. Cir. 1982) (per curiam) (emphasis in original).  *See Meeropol v. Meese*, 790 F.2d 942, 952-53, 252 U.S. App. D.C. 381 (D.C. Cir. 1986) ("[A] search is not unreasonable simply because it fails to produce all relevant material; no [large] search . . . will be free from error.").

PHR claims that Defendants' declarations are insufficiently detailed and therefore insufficient to sustain their burden of proof with respect to the adequacy of their searches.  In addition, they contend that Defendants' searches were unduly restrictive because they: (1) failed

to contact certain individuals who are alleged to have made statements regarding government investigations into the underlying events; (2) did not conduct a search for responsive documents in Afghanistan; and (3) used flawed search terms and conducted a search that was too limited in its temporal scope.  PHR submits that because of such incompliance, the Defendants should be compelled to conduct new searches and to submit new affidavits in support thereof.  Pl.'s Reply at 15.

### A.  Sufficiency of Defendants' Declarations

To sustain its burden on summary judgment, an agency may rely upon affidavits to demonstrate the adequacy of its search.  An agency's submissions will be relied upon if they are found to be "relatively detailed, nonconclusory, and submitted in good faith."  *Greenberg v. U.S. Dept. of Treasury*, 10 F. Supp. 2d 3, 12-13 (D.D.C. 1998) (citing *Steinberg v. DOJ*, 23 F.3d 548, 551, 306 U.S. App. D.C. 240 (D.C. Cir. 1994)).  Courts generally expect affidavits to describe, at minimum, the search methods employed and the files targeted.  *See Ferranti v. BATF*, 177 F. Supp. 2d 41, 47 (D.D.C. 2001) ("[a]ffidavits that include search methods, locations of specific files searched, descriptions of searches of all files likely to contain responsive documents, and names of agency personnel conducting the search are considered sufficient").  Agency affidavits that bear sufficient detail are presumed to be in good faith, and are to be taken at face value and relied upon without further investigation during a court's *de novo* review.  This presumption can only be rebutted with clear evidence of bad faith, and not by "purely speculative claims about the existence and discoverability of other documents."  *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200, 288 U.S. App. D.C. 324 (D.C. Cir. 1991) (internal quotations omitted).

Accompanying their Motion for Summary Judgment, Defendants submitted eight declarations: seven from the DOD and one from the State Department.  Of these eight, PHR

specifically contests the adequacy of the declarations provided by: (1) the Office of the Deputy
Assistant Secretary of Defense for Central Asia (Scott Schless Decl. (Defs.' Ex. C)); (2)
USSOCOM, and its service component, U.S. Army Special Operations Command ("USASOC")
(Steven A. Hummer Decl. (Defs.' Ex. G)); and (3) the DIA and its two major component
directorates, the Directorate for Analysis ("DI") and the Directorate for Human Intelligence
("DH") (Alesia Y. Williams Decl. (Defs.' Ex. E)).  Accompanying their Reply brief, Defendants
submitted three supplemental declarations that addressed alleged deficiencies in the original
declarations.  *See* Supplemental Declaration of Alesia Y. Williams (Defs.' Ex. I); Supplemental
Declaration of Jacqueline J. Scott (Defs.' Ex. J); Supplemental Declaration of Steven A.
Hummer (Defs.' Ex. K).

> **i.      Declaration Supporting the Search Conducted by the Office of the Deputy
> Assistant Secretary of Defense for Central Asia**

The declaration submitted by Scott Schless, the Principal Deputy to the Deputy Assistant
Secretary of Defense of the Office of Central Asia, is sufficiently detailed.  Schless Decl. ¶ 1
(Defs.' Ex. C).  It provides that in August of 2007, action officers in the Afghanistan directorate
searched hard copy files available in the Central Asia Office, and the FOIA Program Manager
from the Office of the Deputy Assistant Secretary of Defense for Asia Pacific Security Affairs
("APSA") searched the electronic files of the Office of Central Asia.  *Id.* at ¶ 3.  Schless cites the
search terms used in the electronic review and describes the two documents that were produced
by the electronic search.  *Id.*  Because the Schless Declaration is sufficiently detailed, it was not
incumbent upon the Defendants to provide a supplemental declaration in support of the search
conducted under the supervision of the Office of the Deputy Assistant Secretary of Defense for
Central Asia.

> **ii.     Declarations Supporting the Search Conducted by USSOCOM and USASOC**

PHR contests the declarations submitted in support of the searches conducted by USSOCOM, and its service component, U.S. Army Special Operations Command ("USASOC"), on the basis that they are impermissibly vague and confusing and "do[] not describe with specificity how the search was conducted, who conducted it, or the process used to identify responsive documents."  Pl.'s Reply at 15.

USSOCOM provided two declarations from Brigadier General Steven A. Hummer that thoroughly describe the procedures, locations, and people involved in the searches.  *See* Hummer Decl. (Defs.' Ex. G); Hummer Suppl. Decl. (Defs.' Ex. K).  They explain how USASOC conducted hard-copy and electronic searches in its constituent directorates that were deemed likely to contain responsive documents.  Moreover, USASOC even broadened its search by referring the request up the chain of command to USSOCOM, which in part, then tasked its four service components to conduct internal searches of their own.  Hummer Decl. ¶ 4; Hummer Suppl. Decl. ¶ 2.  USSOCOM's supplemental declaration also provides the search terms that were employed to locate responsive documents.  Hummer Suppl. Decl. at ¶ 7.  In sum, affidavits submitted by USSOCOM and USASOC bear the requisite indicia of thoroughness.  *See Oglesby*, 920 F.2d at 68 (noting that affidavits must be "reasonably detailed . . . , setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched").

### iii.    Declarations Supporting the Search Conducted by DIA and its Two Major Directorates, the Directorate for Analysis ("DI") and the Directorate for Human Intelligence ("DH")

Finally, PHR challenges the declarations submitted by the DIA, which describe the searches conducted by two of its directorates, the Directorate for Analysis ("DI") and the Directorate for Human Intelligence ("DH").

Alesia Y. Williams, the Chief of the FOIA Services Section within the DIA, provided

two declarations that explain in sufficient detail the nature and scope of the searches conducted

within the DIA. *See* Williams Decl. (Defs.' Ex. E); Williams Suppl. Decl. (Defs.' Ex. I). The

declarations outline the organizational structure and functions of the DIA and its constituent

directorates. They explain in detail the processing of PHR's FOIA request and the searches

conducted within the DI, the DH, and the Research and Reference Library ("Library")—the

directorates deemed reasonably likely to have responsive records. Williams Decl. ¶ 9. The

declarations also identify many of the databases searched, and the types of searches and search

terms that were employed.

PHR faults the DIA's submissions for not identifying the specific offices within the DI

and DH directorates that were tasked with search responsibilities. In response, Defendants

explain that the disclosure of information on these offices would reveal DIA's organizational

structure—information that is protected by statute. *See* Defs.' Reply at 4 (citing 10 U.S.C. §

424(a), (b)).

This Court finds that the DIA properly withheld the sensitive identifying information at

issue, including the name, geographic location, and subject matter responsibilities of some of its

offices. Williams Suppl. Decl. ¶ 9. This data is protected under 10 U.S.C. § 424, which

authorizes the withholding of information relating to "the organization or any function of an

organization of the Department of Defense," such as the DIA. Nevertheless, the DIA has still

provided significant detail on the nature of the search conducted within the directorates'

offices—as much as could be reasonably expected in light of Defendants' legitimate concern in

preventing the disclosure of classified information. Within the DI, target files were searched by

"manually opening and reading every document dealing with the time period specified in the

request letter." *Id.* at ¶ 12. The searching analyst also "manually opened and read every document" that referred to the Jowzjan, Faryab, and Sari-pol provinces, Rashid Dostum, and Dasht-e-Leili. *Id.* The classified electronic file systems that were searched by the DI and the search terms that were used in the search were also identified. Williams Decl. ¶ 10; Williams Suppl. Decl. ¶ 11. In addition, the tasked office within the DH searched "all of its electronic files and hard copy files," using the search terms "Dasht-e-Leili, Sheberghan, Mazar-i-Sharif, and Grave." Williams Suppl. Decl. ¶ 14.

Defendants have satisfied their burden of explicating the "scope and method of the search" in "reasonable detail" through their proffered declarations. *Kidd*, 362 F. Supp. 2d at 295. This Court is able to assess DIA's search to the extent necessary to determine that it satisfied its burden in conducting a search "reasonably calculated to uncover all relevant documents." *Weisberg*, 705 F.2d at 1351.

## B. Adequacy of Defendants' Searches with Respect to the Contact of Certain DOD Officials

PHR contends that the Defendants' searches were unreasonable because they did not contact DOD officials who may have known where responsive documents were located. PHR cites the *Newsweek* article from August of 2002 that first broke the story of the underlying events in the American media. (Pl.'s Ex. 3.) In this article, DOD spokesman Lt. Col. Lapan is quoted as stating that CENTCOM had looked into the alleged killings of Taliban fighters. *Id.* at 6. In addition, the article notes that Col. Mulholland, the commander of the Fifth Special Forces Group, had headed an investigation into the container deaths. *Id.* at 7.

PHR originally contended, in its cross-motion for summary judgment, that Defendants' search was inadequate because they failed to contact Lt. Col. Lapan and Col. Mulholland, who likely had personal knowledge of the DOD investigation. Pl.'s Mot. Summ J. at 18-19.

Defendants subsequently interviewed Col. Mulholland, who stated that that he was not aware of any additional responsive documents and that he was not aware of any investigations into allegations relating to the deaths or mass grave.  Hummer Suppl. Decl. ¶ 9.  In its Reply brief, PHR now maintains that Defendants' decision not to contact Lt. Col. Lapan is a violation of their FOIA obligations.

The fact that Lt. Col. Lapan was not contacted does not undermine the legitimacy of Defendants' searches because there is no "positive indication" in the record that he had possession or knowledge of any responsive documents.  Moreover, Defendants' action in contacting Col. Mulholland does not oblige them to contact Lt. Col. Lapan as well, or otherwise raise any substantial doubt regarding the government's efforts.  While PHR's FOIA request specifically mentions Col. Mulholland, it does not include any reference to Lt. Col. Lapan.  (Pl.'s Ex. 2, at p.3.)  The FOIA request references the *Newsweek* article from 2002, but agencies are not required to personally contact every individual that may be mentioned in an article that is merely cited in a request.  A responding agency must "construe a FOIA request liberally," *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890, 315 U.S. App. D.C. 177 (D.C. Cir. 1995), but it is not "obliged to look beyond the four corners of the request for leads to the location of responsive documents."  *Kowalczyk v. DOJ*, 73 F.3d 386, 389, 315 U.S. App. D.C. 286 (D.C. Cir. 1996).  *See Miller v. Casey*, 730 F.2d 773, 777, 235 U.S. App. D.C. 11 (D.C. Cir. 1984) (stating that an agency is "bound to read [a FOIA request] as drafted, not as either agency officials or [the requester] might wish it was drafted").

Plaintiffs cite to *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325, 336 U.S. App. D.C. 386 (D.C. Cir. 1999) and *Jackson v. U.S. Attorney's Office, Dist. of N.J.*, 362 F. Supp. 2d 39 (D.D.C. 2005) in support of their argument.  In *Valencia-Lucena*, the plaintiff, a convicted

drug dealer, submitted FOIA requests to the Coast Guard specifically seeking a logbook from one of its ships, which had been used as evidence against him during his trial.  180 F.3d at 323-25.  In ruling on plaintiff's FOIA request, the court found the Coast Guard's search to be inadequate because, *inter alia*, it failed to contact the ship's captain for information on the logbook, despite the fact that the captain had allegedly consulted the logbook while testifying against the plaintiff at trial.  *Id.* at 327-28.  Likewise, in *Jackson*, the plaintiff sought documents relating to the decision of the local United States Attorney's Office not to investigate matters relating to plaintiff's claim of discrimination.  362 F. Supp. 2d at 41.  Prior to submitting his FOIA request, plaintiff had learned that an official at the U.S. Attorney's Office had issued a written directive to terminate the investigation.  *Id.*  This Court ruled that the defendants did not comply with their search obligations under FOIA because they failed to contact the author of the directive and the FBI agent that alerted plaintiff to its existence.  *Id.* at 42.  The holdings in these two cases stand for the proposition that "[w]hen all other sources fail to provide leads to the missing record, agency personnel should be contacted if there is a close nexus . . . between the person and the particular record."  *Valencia-Lucena*, 180 F.3d at 328; *Jackson*, 362 F. Supp. 2d at 41-42.

The holdings in *Valencia-Lucena* and *Jackson* are inapposite because they are closely based on unique and factually dissimilar scenarios.  Both of these cases involved specifically targeted records and individuals who were identified as "'likely to turn up the information requested.'"  *Valencia-Lucena*, 180 F.3d at 327 (quoting *Oglesby*, 920 F.2d at 68).  In this case, however, PHR's search is not focused upon the recovery of any particular document, nor is it suggested that Lt. Col. Lapan has ever borne a "close nexus" to any known and sought-after document.  There is no clear indication in the record that Lt. Col. Lapan has had exceptional

access to, or a unique knowledge of, any records relating to the investigation.  Furthermore, this case is distinguishable from cases where agencies refused to conduct searches in certain locations despite the agencies' acknowledgement that such locations were "likely to have" responsive documents.  *See, e.g.*, *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 13-14 (D.D.C. 2004) (faulting defendant for not referring a FOIA request to an office that likely held responsive documents); *Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115, 120-21 (D.D.C. 2005) (finding search to be inadequate when agency failed to produce documents known to have originated in a certain office); *Campbell v. DOJ*, 164 F.3d 20, 28, 334 U.S. App. D.C. 20 (D.C. Cir. 1998) (holding that government's search was inadequate where its own documents revealed that requested documents were likely contained in another of its record systems); *Valencia-Lucena*, 180 F.3d at 325-27 (finding agency's search to be unreasonable where the agency recognized that there might be responsive documents in a records center that it declined to search).

PHR's argument regarding Lt. Col. Lapan is similar to the unsuccessful argument advanced by the plaintiffs in *Amnesty International USA v. CIA*, No. 07 Civ. 5435, 2008 U.S. Dist. LEXIS 47882, 2008 WL 2519908, at *38-45 (S.D.N.Y. June 19, 2008).  In *Amnesty International*, the plaintiffs claimed that the Department of Homeland Security's ("DHS") search was unreasonable in part because the agency did not compile a list of individuals deemed subject to its secret detention program and then conduct a search for documents relating to these names. *Id.* at *38-40.  In rejecting this contention, the court found that the government lacked notice of any obligation to search for these names as they were not actually stated in the request, and were merely mentioned in materials cited in a footnote in the request.  *Id.* at *40-41.  The court observed that to compile such a list of names, the government agency would need to conduct its

own further research and investigation—an obligation that is not mandated under FOIA.  *Id.* at *39-40.  Finally, the plaintiffs' suggestion that there were obvious "leads" in the case that would prompt further searches was rejected, as plaintiffs could only rely upon news articles and reports authored by non-governmental sources.  The court concluded that "the additional documents relied on in this case do not indicate that there remain [agency] documents that are responsive to the Request and which have not been produced."  *Id.* at *44-45.

As in *Amnesty International*, PHR's request to have Lt. Col Lapan interviewed is absent from its FOIA petition, and is entirely based upon his mention in a news article.  Thus, Defendants were not properly notified of any obligation to make inquiries relating to Lt. Col Lapan.  In addition, PHR's request is essentially a *post hoc* attempt to open a new line of inquiry in its pursuit of information on the underlying events.  In this respect PHR is seeking remedies that are beyond the purview of FOIA and its focus upon the disclosure of *documents*.  *See Amnesty International*, 2008 U.S. Dist. LEXIS 47882, 2008 WL 2519908, at *40 ("FOIA is a mechanism to obtain access to records, not answers to questions."); *Hudgins v. IRS*, 620 F. Supp. 2d 19, 21 (D.D.C. 2003) ("FOIA creates only a right of access to records, not a right to personal services").  In the absence of any "positive indications of overlooked materials," *Founding Church of Scientology*, 610 F.2d at 837, the Defendants' decision not to contact Lt. Col. Lapan does not cast any doubt upon the legitimacy of their searches.

## C. Adequacy of Defendants' Searches with Respect to the Discovery of Documents in Afghanistan

PHR claims that the geographic scope of Defendants' searches was too limited in that they failed to conduct sufficient searches for documents in Afghanistan.

Jacqueline J. Scott, the Command FOIA and Privacy Act Officer for CENTCOM submitted two detailed declarations describing the entity's search procedures and scope.  *See*

Jacqueline J. Scott Decl. (Defs.' Ex. F); Scott Suppl. Decl. (Defs.' Ex. J).  CENTCOM tasked

Combined Joint Task Force (CJTF) 76, CJTF-82, CJTF-101, and the Combined Security

Transition Command, Afghanistan (CSTC-A), to search for electronic and physical records in

Afghanistan that were responsive to PHR's FOIA request.  Scott Suppl. Decl. ¶¶ 1-3.  In

addition, nine of the Headquarters' CENTCOM directorates and offices were tasked to conduct a

search.  *Id.* ¶ 4.  Scott's Supplemental Declaration also identifies the data storage devices and

systems that were examined, *id.* ¶¶ 7-8, and provides a long list of the search terms that were

employed.  *Id.* ¶ 9.

The Fifth Special Forces Group, which was allegedly located at the Sheberghan prison at

the time of the underlying events, *see* Pls.' Ex. 2 at 2, conducted a search for responsive

documents within its control.  Hummer Suppl. Decl. ¶ 6.  In addition, the DIA "search[ed] all

areas, databases, files, and offices likely to have records pertaining to a mass grave at Dasht-e-

Leili."  Williams Suppl. Decl. ¶ 10.  More specifically, the DIA's two major directorates, the DI

and the DH, and the DIA's classified library all conducted keyword and manual searches of the

DIA's classified web and all electronic and hard copy files that would likely contain responsive

documents relating to Afghanistan.  *Id.* at ¶¶ 9-14.  In doing so, they employed relevant search

terms referring to the Jowzjan, Faryab and Sari-pol provinces, Rashid Dostum, and Dasht-e-

Leili.  *Id.* at ¶¶ 10, 12.

Defendants have produced "reasonably detailed affidavit[s]" that set forth "the search

terms and the type of search performed, and averring that all files likely to contain responsive

materials . . .  were searched."  *Ogelsby*, 290 F.2d at 68.  Presuming that these declarations were

issued in good faith, and in the absence of any rebutting evidence of bad faith, this Court finds

that the geographic scope of Defendants' search was not unreasonable under the circumstances.

Defendants tasked those offices and directorates that were reasonably expected to contain responsive documents.  These entities thereupon conducted searches in Afghanistan and searched for documents referencing relevant geographic locations in Afghanistan.  Defendants' interpretation of PHR's FOIA request was not unduly narrow, as the request does not include any instruction to search for documents that refer to specific provinces in Afghanistan.  Finally, there are no positive indications in the record that any requested documents were located in any provinces that were not searched.  *Compare Valencia-Lucena*, 180 F.3d at 327 (finding search to be unreasonable because government refused to search a federal records center that it had acknowledged might contain responsive documents), *with Amnesty International*, 2008 U.S. Dist. LEXIS 47882, 2008 WL 2519908, at *44-45 (rejecting plaintiffs' request for an additional name search in part because there was no indication that such an inquiry would lead to any overlooked documents).

### D.   Adequacy of Defendants' Searches with Respect to Search Terms Employed and the Temporal Scope of CENTCOM's Search

#### 1.   Search Terms Employed

PHR contends that the Defendants' search terms were not "reasonably calculated to uncover all relevant documents requested," Pl.'s Mot. Summ. J. at 19, and that their searches failed to utilize a "wide range of . . . useable search terms" that were included in the FOIA request.  *Id.* at 20.

Contrary to the suggestion in PHR's briefs, the FOIA petition does not set forth a discrete list of search terms, and even if PHR had included such a list, there is no bright-line rule requiring agencies to use the search terms proposed in a FOIA request.  *See Nielsen v. U.S. Bureau of Land Management*, 252 F.R.D. 499, 514 (D. Minn. 2008) (finding that there was no support "for the proposition that a FOIA claimant can dictate the search terms to be used as the

benchmark for determining whether an agency's search is reasonable").  Additionally, as evidenced in their affidavits, Defendants properly exercised their discretion in crafting lists of search terms that they believed to be reasonably tailored to uncover documents responsive to the FOIA request.  As mentioned above, in responding to a FOIA request, an agency is only held to a standard of reasonableness; as long as this standard is met, a court need not quibble over every perceived inadequacy in an agency's response, however slight.  *See Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776, 354 U.S. App. D.C. 49 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch.").

### 2.  Temporal Scope of CENTCOM's Search

PHR's final challenge concerns the temporal scope of CENTCOM's search.  Defendants acknowledge that the search conducted by CENTCOM was designed to review documents only within the months of November and December of 2001 (Scott Supp. Decl. ¶ 9), and in this respect, Defendants have interpreted PHR's FOIA request too narrowly.  While the underlying events occurred in November and December of 2001, PHR have clearly requested all records "pertaining" or "relating to" the underlying events, including any subsequent investigations. Pls.' Ex. 2 at 3-4.  For instance, the FOIA request expressly seeks "[a]ll records pertaining to the existence or reported existence of a grave in or around Dasht-e-Leili (using this or other spelling) in Afghanistan in November or December 2001, including records of physical evidence of a mass grave or investigations conducted *contemporaneously or subsequently* to determine whether such a grave exists . . . ." *Id.* at 4 (emphasis added).

Consequently, summary judgment is appropriate for PHR on the adequacy of CENTCOM's search.  There is no genuine dispute that the temporal scope of CENTCOM's search was too narrow and did not comport with PHR's FOIA petition.  Therefore, CENTCOM must conduct a new search that is designed to obtain responsive documents generated from November 1, 2001, until the start date of its new search.  *See, e.g.*, *Edmunds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105, 110-111 (D.D.C. 2005) (endorsing the start date of a search as an appropriate cut-off date); *Defenders of Wildlife*, 314 F. Supp. 2d at 12 n.10 (same).  Defendants may submit a renewed motion for summary judgment addressing the results of CENTCOM's new search, and if CENTCOM seeks to withhold documents found pursuant to this new search, it must submit supplementary affidavits justifying such withholdings.

## II.        Propriety of Defendants' Withholdings under FOIA's Exemptions

PHR challenges Defendants' withholding of information under the cited FOIA exemptions, noting that they have not satisfied their burden of adequately describing, in sufficient detail, the documents claimed to be exempt.  To resolve whether the exemptions were properly invoked, PHR requests that the withheld documents be made available for *in camera* review.

Defendants have submitted five declarations and four accompanying *Vaughn* indexes that address the withholding of information deemed responsive to PHR's FOIA request.  *See* William T. Kammer Decl. (Defs.' Ex. A.) Mark S. Patrick Decl. (Defs.' Ex. B); Steven A. Hummer Decl. (Defs.' Ex. G); Alesia Y. Williams Decl. (Defs.' Ex. E); Margaret P. Grafeld Decl. (Defs.' Ex. H).  While Defendants have cited FOIA Exemptions 1, 2, 3, and 6 as bases for nondisclosure, they predominately depend upon Exemption 1 to withhold information purportedly relating to

national security and foreign policy matters.  As a result, the following analysis largely focuses on assessing Defendants' reliance upon Exemption 1.

### A.  Legal Standard for Reviewing Withholdings under FOIA's Exemptions

FOIA requires government agencies to disclose documents deemed responsive to a properly fashioned request unless they can claim protection under one or more of nine statutory exemptions.  5 U.S.C. § 552(a), (b).  The Act also requires an agency to disclose "[a]ny reasonably segregable portion of a record," *id.* § 552(b), after redaction or deletion of exempt portions, unless they are "inextricably intertwined with exempt portions."  *Mead Data Cent. Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260, 184 U.S. App. D.C. 324 (D.C. Cir. 1977); *see also Schiller v. NLRB*, 964 F.2d 1205, 1209-10, 296 U.S. App. D.C. 84 (D.C. Cir. 1992) (discussing the "segregability requirement").  While the exemptions in FOIA represent Congress' recognition that "legitimate governmental and private interests could be harmed by release of certain types of information," *FBI v. Abramson*, 456 U.S. 615, 621, 102 S. Ct. 2054, 72 L. Ed. 2d 376 (1982), they are "limited" in scope and "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S. Ct. 1592, 48 L. Ed. 2d 11 (1976).  Consequently, the exemptions are narrowly construed and the "burden is on the agency to sustain its action."  5 U.S.C. § 552(a)(4)(B).  Under FOIA, courts review an agency's reliance upon a FOIA exemption to withhold documents *de novo*.  *See Phillippi v. CIA*, 546 F.2d 1009, 1013, 178 U.S. App. D.C. 243 (D.C. Cir. 1976).

FOIA cases present a "unique evidentiary configuration" whereby the responding agency "alone possesses, reviews, discloses, and withholds the subject matter of the request."  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006); *see also King v. DOJ*, 830 F.2d 210, 218, 265 U.S. App. D.C. 62 (D.C. Cir. 1987) (noting the "asymmetrical distribution of

knowledge that characterizes FOIA cases").  To facilitate an agency's task in justifying its

withholdings without needlessly sacrificing their confidential status, an agency may rely upon

*Vaughn* indexes, or other forms of affidavits, to describe the material at issue.  These

submissions enable "the adversary system to operate by giving the requester as much

information as possible, on the basis of which he can present his case to the trial court."  *Lykins*

*v. DOJ*, 725 F.2d 1455, 1463, 233 U.S. App. D.C. 349 (D.C. Cir. 1984).  In addition, they

provide "the reviewing court a reasonable basis to evaluate the claim of privilege."  *Gallant v.*

*NLRB*, 26 F.3d 168, 172-73, 307 U.S. App. D.C. 27 (D.C. Cir. 1994) (internal quotation marks

and citation omitted).

 An agency's affidavits and *Vaughn* indexes are evaluated primarily on the basis of the

detail they provide about the withheld material; at minimum, the document descriptions should

identify the "length, date, author and brief description of each document" at issue.  *Oglesby v.*

*U.S. Dep't of Army*, 79 F.3d 1172, 1178-81, 316 U.S. App. D.C. 372 (D.C. Cir. 1996).  The D.C.

Circuit focuses upon "the function, not the form," *Keys v. DOJ*, 830 F.2d 337, 349, 265 U.S.

App. D.C. 189 (D.C. Cir. 1987), meaning that the affidavits are also expected to provide a

"relatively detailed justification, specifically identifying the reasons why a particular exemption

is relevant and correlating those claims with the particular part of a withheld document to which

they apply." *Mead Data*, 566 F.2d at 251.  In sum, an agency's burden is considered to be

satisfied when its submissions explicate "the justifications for nondisclosure with reasonably

specific detail, demonstrate that the information withheld logically falls within the claimed

exemption, and are not controverted by either contrary evidence in the record nor by evidence of

agency bad faith." *Miller*, 730 F.2d at 776 (quotation omitted).  On the other hand, agency

statements are not accorded deference if they are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Ogelsby*, 79 F.3d at 1176.

### B. Legal Standard for Reviewing Withholdings under Exemption 1 of FOIA

Exemption 1 protects matters "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  In claiming protection under Exemption 1, Defendants rely on Executive Order 12,958, which allows for the classification of information that "could be expected to result in damage to the national security." Exec. Order No. 12,958 § 1.1(a)(4) (1995), *as amended*, 68 Fed. Reg. 15,315 (2003) (hereinafter "EO 12,958").  Of the seven categories of classification set forth in the Executive Order, Defendants claim that the withheld material relates to: (1) foreign government information; (2) intelligence activities, sources or methods; and (3) foreign relations or foreign activities of the United States.  *See* Defs.' Mot. Summ. J. at 14-15 (citing Exec. Order 12958, § 1.4).

To withhold material under Exemption 1, Defendants must establish that they complied with proper procedures in classifying materials and that the withheld information falls within the substantive scope of EO 12,958.  *See Salisbury v. United States*, 690 F.2d 966, 971-72, 223 U.S. App. D.C. 243 (D.C. Cir. 1982).  As under the other FOIA exemptions, a responding agency may satisfy its burden with affidavits that explain with reasonable specificity its reasons for nondisclosure.  However, courts must take into account certain additional factors when reviewing claims under the national security exemption.  In these situations, judges are mindful that issues of national security are within the unique purview of the executive branches, *Zadvydas v. Davis*, 533 U.S. 678, 696, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001); *Center for National Security Studies v. DOJ*, 331 F.3d 918, 926-27, 356 U.S. App. D.C. 333 (D.C. Cir.

2003), and that as a practical matter, "[f]ew judges have the skill or experience to weigh the repercussions of disclosure of intelligence information." *Weissman v. CIA*, 565 F.2d 692, 697, 184 U.S. App. D.C. 117 (D.C. Cir. 1977); *see also McGehee v. Casey*, 718 F.2d 1137, 1148, 231 U.S. App. D.C. 99 (D.C. Cir. 1983) ("'the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular record.'") (quoting S. Rep. No. 1200, 93d Cong., 2d Sess. 12, U.S.C.C.A.N. 1974, p. 6267 (1974) (Conference Report on the FOIA Amendments)). Consequently, "the court owes substantial weight to detailed agency explanations in the national security context." *King*, 830 F.2d at 217.

Nevertheless, judicial deference for an agency's justifications under Exemption 1 is only warranted when the agency's affidavits are first found, at a minimum, to "contain sufficient detail to forge the 'logical connection between the information [withheld] and the claimed exemption.'" *Oglesby*, 79 F.3d at 1178 (quoting *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 78, 260 U.S. App. D.C. 205 (D.C. Cir. 1987)). Therefore, an agency is in no way excused from its burden to properly describe the withheld material that is claimed to be protected by Exemption 1. *See Center for National Security Studies*, 331 F.3d at 940 ("no amount of deference can make up for agency allegations that display, for example, a 'lack of detail and specificity, bad faith, [or] failure to account for contrary record evidence,' since 'deference is not equivalent to acquiescence'") (Tatel, J., dissenting) (quoting *Campbell*, 164 F.3d at 30).

### C. Legal Standard for Employing *In Camera* Review in FOIA Cases

Under FOIA, district courts are afforded the option of utilizing *in camera* review "to determine whether [the agency's records] or any part thereof shall be withheld under any of the exemptions," 5 U.S.C.§ 552(a)(4)(B), and its decision may not be disturbed on appeal absent an

abuse of discretion.  *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996, 331 U.S. App. D.C. 178

(D.C. Cir. 1998).  Nevertheless, while district court judges are said to have "broad discretion in

determining whether *in camera* review is appropriate," *Armstrong v. Executive Office of the*

*President*, 97 F.3d 575, 578, 321 U.S. App. D.C. 118 (D.C. Cir. 1996), the D.C. Circuit has

cautioned that trial courts should not readily rely upon the procedure without cause.  *See, e.g.*,

*Ray v. Turner*, 587 F.2d 1187, 1195, 190 U.S. App. D.C. 290 (D.C. Cir. 1978) ("*[i]n camera*

inspection requires effort and resources and therefore a court should not resort to it routinely on

the theory that 'it can't hurt '"); *Mead Data*, 566 F.2d at 250 n.10 ("*[i]n camera* inspection of

disputed documents places a very burdensome demand on federal trial courts . . . [and] also

creates problems for appellate review").

The D.C. Circuit has proposed a set of prudential factors for a district court to consider

before exercising its discretion to employ *in camera* review.  *See Allen v. CIA*, 636 F.2d 1287,

1293, 205 U.S. App. D.C. 159 (D.C. Cir. 1980).  These factors include: (1) judicial economy; (2)

the conclusory nature of the agency affidavits; (3) bad faith on the part of the agency; (4)

disputes concerning the contents of the documents; (5) whether the agency proposes *in camera*

inspection; and (6) the public interest in disclosure.  *Id.* at 1297-99.  Although there is no

indication of bad faith on the part of the Defendants, this Court finds—as a general matter—that

the weight of these factors tilts in favor of *in camera* review in this case.  The contested

documents, are "few in number and of short length," meaning that instead of being burdensome

or costly, *in camera* review would be an efficient means of resolving the issues at stake.[4]  *Allen*,

636 F.2d at 1298; *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393, 265 U.S. App. D.C. 240

(D.C. Cir. 1987).  The parties' disputes concern the contents of the withheld documents, and

---

[4] PHR notes that this Court "would need to review fewer than 25 pages of documents *in camera* to verify the Defendants' claimed exemptions."  Pl.'s Reply at 17-18.

there is a considerable public interest in the war in Afghanistan.  Finally, other procedures aimed

at resolving the issue have already been employed, as Defendants have had full opportunity to

justify its withholdings through affidavits (both original and supplementary) and oral argument.

*See EPA v. Mink*, 410 U.S. 73, 93, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973) (noting that an agency

should be given the opportunity to provide affidavits and oral testimony before *in camera* review

is employed).

Notwithstanding the factors militating for *in camera* review, this Court is mindful that "in

national security cases, a district court exercises a wise discretion when it limits the number of

documents it reviews *in camera*."  *Armstrong*, 97 F.3d at 580; *see also Hayden v. NSA*, 608 F.2d

1381, 1387, 197 U.S. App. D.C. 224 (D.C. Cir. 1979) (stating that in the national security

context, "*in camera* review is a 'last resort' to be used only when the affidavits are insufficient

for a responsible *de novo* decision") (internal quotations omitted).  Accordingly, the propriety of

inspection will be determined as to each contested document, and will depend on the adequacy of

the explanations provided by the government in its accompanying affidavits.

### D.  Defendants' Affidavits Concerning Material Withheld under FOIA's Exemptions

In view of the standards set forth above, this Court proceeds to review the documents at

issue to determine whether the Defendants' are entitled to summary judgment with respect to any

of their withholdings.  Included in this analysis is a determination of whether Defendants'

submissions are adequate, or whether *in camera* review is warranted under the circumstances.

### 1)  Affidavits of William T. Kammer

William T. Kammer provided a declaration and *Vaughn* index in his role as the Chief of

the Office of Freedom of Information within the Executive Services Directorate of the DOD.

Kammer Decl. ¶ 1 (Defs.' Ex. A).  Kammer issues policy on FOIA matters and supervises the

processing of FOIA requests and appeals for various offices, including the Office of the

Secretary of Defense (OSD).  Kammer's declaration relates to documents provided by two OSD

components: the Correspondence Control Division (CCD) and the Office of the Deputy Assistant

Secretary of Defense for Asia Pacific Security Affairs (APSA).  *Id.* at ¶ 4.  After the completion

of its search, APSA provided PHR with two pages of information, and neither page included any

redacted material that was deemed responsive.  *Id.* at ¶ 9.  The CCD provided PHR with six

responsive documents.  In these documents, Exemption 6 is cited for the purpose of withholding

the "names of OSD personnel who are not decision makers from four responsive documents.  *Id.*

at ¶ 5.

Exemption 6 permits agencies to withhold "personnel and medical files and similar files

the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5

U.S.C. § 552(b)(6).  The term "similar files" has been broadly interpreted to include information

that "applies to a particular individual."  *U.S. Dep't of State v. Washington Post Co.*, 456 U.S.

595, 602, 102 S. Ct. 1957, 72 L. Ed. 2d 358 (1982).  Once this minimal threshold is satisfied,

courts balance the privacy interests cited by the government against the public's interest in the

release of the requested information.  *Lepelletier v. FDIC*, 164 F.3d 37, 46, 334 U.S. App. D.C.

37 (D.C. Cir. 1999).  However, the "only relevant public interest in disclosure to be weighed in

this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is

contributing significantly to public understanding of the operations or activities of the

government."  *Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495-96, 114 S. Ct.

1006, 127 L. Ed. 2d 325 (1994) (internal citation and quotation marks omitted).

In the CCD documents, all responsive information has been disclosed with the exception of a few names that were redacted because "their release would constitute a clearly unwarranted invasion of the personal privacy of individuals."  Kammer Decl. ¶ 5.

This Court finds that the names at issue were properly withheld.  As an initial matter, this Court acknowledges that Exemption 6 has been read to protect "not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[] a palpable threat to privacy.'"  *Judicial Watch*, 449 F.3d at 152-53 (quoting *Carter*, 830 F.2d at 391).  With regard to the balancing test, PHR has not suggested that any public benefit would result from the discovery of these names;[5] nor is this Court able to divine any meaningful public interest in obtaining "information about private citizens that is accumulated in various governmental files but that reveals nothing about an agency's own conduct."  *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773-74, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989).  As a result, summary judgment is entered in favor of Defendants with respect to the information withheld in the documents produced by the CCD.

### 2)  Affidavits of Mark S. Patrick

Mark S. Patrick serves as the Chief of the Information Management Division within the Joint Staff, and he oversees FOIA searches and reviews of the Joint Staff's corporate records. Patrick Decl. ¶¶ 1, 2 (Defs.' Ex. B.)  Patrick's submissions concern a single withheld document—a U.S. Space Command (SPACECOM) Situation Report for Operations Noble Eagle and Enduring Freedom, dated September 6, 2002, which is described as a "worldwide summary of the wide range of SPACECOM activities at that time."  *Id.* at ¶ 4.  After "conferring with subject matter experts from the J-5 Central Asia/South Asia Division," Patrick determined that portions of the document contained information that was shielded from disclosure under

---

[5] Indeed, in its briefs on summary judgment, PHR has not specifically challenged the CCD's withholdings.

Exemption 1.  *Id.* at ¶ 5.  He explains that "release of this information would reveal classified foreign government information, as well as intelligence activities, sources, or methods, and could hinder efforts by DoD to obtain similar information in the future."  *Id.*

The seven page document provided by the Joint Staff contains two pages of responsive content, the disclosed portion of which references media reports concerning mass graves and the capture and shipment of Taliban fighters in Afghanistan.  The greater portion of the responsive material on the final two pages has been redacted in full.  While Patrick's submissions provide the most basic identifying information on the withheld portions, they do not describe their content, or explain—in specific, non-generic terms—why it fits within the scope of Exemption 1.  Instead, Patrick's declaration merely recites the exact language of EO 12,958 as a justification for nondisclosure.  *See Allen*, 636 F.2d at 1298 ("where the agency affidavits merely parrot the language of the statute and are drawn in conclusory terms, the court's responsibility to conduct *de novo* review is frustrated").  Responding agencies are charged with the burden of "describing the withheld documents to the greatest extent possible without disclosing information that must be protected."  *Ogelsby*, 79 F.3d at 1184.  Because Patrick's submissions are insufficiently detailed, Defendants cannot rely upon them to justify their withholdings.  Accordingly, the SPACECOM Situation Report at issue must be submitted in unredacted form for *in camera* review.

### 3)   Affidavits of Steven A. Hummer

Brigadier General Steven A. Hummer, Chief of Staff to USSOCOM, submitted a declaration and a *Vaughn* index in support of the agency's withholdings.  Hummer Decl. ¶ 1 (Defs.' Ex. G.)  USSOCOM produced seven responsive documents that are described as

intelligence summaries and situation reports.  Portions of six of the produced documents were redacted pursuant to Exemptions 1 and 6.[6]  *Id.* at ¶ 8.

Hummer's submissions address each of the documents individually.  His *Vaughn* index provides general identifying information and broad descriptions of the exempted material, whereas his declaration provides more detail on the content of the information and the justifications for exemption.[7]  The redacted information is described as exempt under Exemption 1 because it either "consists of observations and evaluations from intelligence sources" *Id.* at ¶12, or because it is "information consist[ing] of foreign relations, foreign activities of the United States . . . [and it] include[s] confidential sources."  *Id.* at ¶ 14.  Much of the material is similarly described as subject to Exemption 6 because it "refers to key personnel who may have been involved in important intelligence operations."  *Id.* at ¶ 12.

The redactions in the USSOCOM documents appear to be targeted and precise, and the responsive portions provide the reviewer with some of the surrounding context.  In addition, the redactions are specifically labeled in order to "correlate the claimed exemptions to particular passages."  *Schiller*, 964 F.2d at 1209.  By carefully delineating the exempt from the disclosed information, and by linking the withheld portions to the claimed exemptions, the affidavits afford a basis for finding that the agency has produced all "reasonably segregable" responsive portions of the documents at issue.  *See Armstrong*, 97 F.3d at 578.  Thus, after according the justifications proffered in Hummer's submissions "substantial weight," this Court grants

---

[6] USSOCOM initially referred to Exemption 5, which permits the nondisclosure of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  However, USSOCOM ultimately determined, after further review, that the information did not need to be withheld under Exemption 5.  Hummer Decl. ¶ 8.

[7] In challenging USSOCOM's withholdings, PHR focuses exclusively upon Hummer's *Vaughn* index as providing cursory explanations.  However, when assessing a claim of exemption, reviewing courts consider all of the submissions provided by an agency that address the issue, not merely the *Vaughn* index.  *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) (noting that an agency may "submit other measures in combination or in lieu of the index itself").

summary judgment in favor of Defendants with respect to the documents provided by
USSOCOM.

**4) Affidavits of Alesia Y. Williams**

Alesia Williams, the Chief of the FOIA Services Section for the Defense Intelligence
Agency (DIA), provided a declaration and affidavit that concern the withholdings in two
responsive intelligence reports under Exemptions 1, 2 and 3.  Williams Decl. ¶ 1 (Defs.' Ex. E.)

With respect to the material excised under Exemption 1, Williams' declaration merely
characterizes it as "non-segerable [sic] classified information" that relates to "intelligence
sources and methods."  Williams Decl. ¶¶ 18, 20.

Information in the documents was also withheld under Exemption 2, which permits
responding agencies to withhold information that is "related solely to the internal personnel rules
and practices of an agency."  5 U.S.C. § 552(b)(2).  This exemption has been construed to protect
"predominately internal" documents in instances where (1) the documents relate to "trivial
administrative matters of no genuine public interest" (known as the "low 2" exemption); (2) the
disclosure of the documents would "significantly risk[] circumvention of agency regulations or
statutes" (known as the "high 2" exemption).  *Crooker v. Bureau of Alcohol, Tobacco &
Firearms*, 670 F.2d 1051, 104, 216 U.S. App. D.C. 232 (D.C. Cir. 1981) (en banc).  Williams
states that the information withheld under the "low 2" exemption pertained to "administrative
handling codes, Intelligence Information Report numbers, internal office symbols, internal phone
numbers and other similar point of contact information, and message routing data."  Williams
Decl. ¶ 22.  The information excised under the "high 2" exemption in document 1 included
"intelligence code words, caveats, country names, and names of international organizations

which DIA shared intelligence with." *Id.* at ¶ 23.  In Document 2, such material included the

"geocoordinates and the preparer's evaluation of the classified source." *Id.* at ¶ 24

Finally, Williams cites Exemption 3 as a basis for nondisclosure.  Exemption 3 allows the

withholding of material that is "specifically exempted from disclosure by statute provided that

such statute . . . requires that the matters be withheld from the public in such a manner as to leave

no discretion on the issue . . . ."  Her declaration cites 10 U.S.C. § 424 as a statute that permits

the non-disclosure of personnel data and information pertaining to the organization and function

any DOD organization, including the DIA.  The information withheld in the two responsive

documents under Exemption 3 concerns DIA personnel and the organizational structure of the

DIA.  Williams Decl. ¶ 26.

This Court finds that Williams' submissions are clearly deficient with respect to claiming

non-disclosure under Exemptions 1 and 3, as they do not "provide specific information sufficient

to place the documents within the exemption category." *Hayden*, 608 F.2d at 1387.  Williams'

submissions expansively describe the purposes for the exemptions, but such discussion does not

compensate for the lack of detail concerning the content of the withheld material or its

connection to a particular exemption. *See Davin v. DOJ*, 60 F.3d 1043, 1051 (3d Cir. 1995)

(noting that an agency must "provide the 'connective tissue' between the document, the deletion,

the exemption and the explanation").

Furthermore, in both documents, large chunks of information were redacted in full, and

two pages from Document 2 were excised in their entirety.  The agency bears the burden of

proving that the redacted information is not segregable from the non-exempt information, 5

U.S.C. § 552(a)(4)(B), and Williams' submissions fail to make a detailed showing in this respect.

Through the blanket use of the three cited exemptions, Defendants' have not satisfied the

segregability requirement.  *See Center for Biological Diversity v. U.S. Marine Corps*, Civ. No.

00-2387, 2003 U.S. Dist. LEXIS 26856, at \*21 (D.D.C. Aug. 21, 2003) (finding insufficient

agency's broad classification of documents as "non-segregable" without providing "enough

information [to] make a finding as to segregability that would sustain summary judgment").

      In sum, the DIA has not given an adequate factual basis for PHR and this Court to

evaluate whether the exemptions have been properly claimed and all reasonably segregable

information has been provided.  *See King*, 830 F.2d at 218 (noting that even in the national

security context, an agency's explanation must be "full and specific enough to afford the FOIA

requester a meaningful opportunity to contest, and the district court an adequate foundation to

review, the soundness of the withholding").  As a result, these documents must be submitted in

unredacted form for *in camera* review.

### 5)  Affidavit of Margaret P. Grafeld

      Finally, Margaret P. Grafeld, the Information and Privacy Coordinator and the Director

of the Office of Information Programs and Services for the State Department, has submitted a

declaration in support of a claim under Exemption 1.  Grafeld Decl. ¶ 1 (Defs.' Ex. H.)  She

notes that the State Department received three documents from the DIA, and that two of them

were ultimately deemed to contain responsive information that was exempt from disclosure.  *Id.*

at ¶ 6.  The information, which has been classified as "top secret," is said to relate directly to

intelligence activities, sources and methods, and the foreign relations and activities of the United

States.  *Id.* at ¶¶ 11, 12, 15.  The two documents are Assessment Roundups from 2002 that were

prepared by the Bureau of Intelligence and Research at the State Department.  *Id.* at ¶ 16.  They

both contain lengthy portions that concern events outside of Afghanistan that were not

responsive to PHR's FOIA request.  Each document begins with a list of contents and the list

items that refer to responsive material in the bodies of the respective documents were disclosed. *Id.* The relevant portions of the documents "describe the circumstances of mass graves in Afghanistan, and attempts to obtain accurate information about them." *Id.* The withheld material on pages 17, 18, and 20 of Document 1 and on page 10 of Document No. 2 are said "to contain information that is based on sensitive intelligence sources and methods." *Id.* The material excised on page 19 of Document 1 identifies the confidential source of the information excised on page 18. *Id.*

Grafeld's declaration supplies the necessary identifying information and descriptions of the withheld material. In addition, the excised material appears to be relatively targeted, and the un-redacted responsive material provides sufficient context to serve as a basis for review. PHR has not specifically challenged the adequacy of Grafeld's declaration, and this Court is not able to discern any significant shortcoming that would prevent a meaningful review of the exemptions claimed. Consequently, after giving "substantial deference" to Grafeld's declaration, summary judgment is granted to Defendants with respect to the information redacted in the documents provided by the State Department.

## CONCLUSION

For the reasons set forth above, this Court concludes that Defendants' Motion for Summary Judgment (Paper No. 15) is GRANTED and Plaintiff's Cross-Motion for Summary Judgment (Paper No. 16) is DENIED with respect to the adequacy of the search conducted by the Defendants, except with respect to the search conducted by CENTCOM. Defendants' motion is DENIED and Plaintiff's cross-motion is GRANTED with respect to the adequacy of the search conducted by CENTCOM. CENTCOM shall conduct a new search for responsive

documents generated from November 1, 2001, until the start date of its new search, in a manner consistent with the Order accompanying this Opinion.

Defendants' motion is GRANTED and Plaintiff's cross-motion is DENIED with respect to the withholdings claimed by the Defendants, except with respect to the withholdings claimed by the Joint Staff and the DIA.  Judgment is deferred with respect to the withholdings claimed by the Joint Staff and the DIA, who shall both submit un-redacted copies of their responsive documents to this Court for *in camera* review.

A separate Order follows.

Dated: December 30, 2009                    /s/_____
                                            Richard D. Bennett
                                            United States District Judge